<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SHAWN L. ROBINSON,                    :
                                      :   Civil Action No. 08-2023 (PGS)
              Plaintiff,              :
                                      :
                                      :
              v.                      :   **OPINION**
                                      :
MICHELLE RICCI, et al.,               :
                                      :
              Defendants.             :

**APPEARANCES:**

     SHAWN L. ROBINSON, Plaintiff <u>pro se</u>
     # 138719
     HSC Building
     P.O. Box 8200
     Cranston, Rhode Island 02920

     JOSEPH M. MICHELETTI, ESQ.
     OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
     DIVISION OF LAW
     P.O. Box 112
     Trenton, New Jersey 08625-0112
     Counsel for Defendants, Ricci and Bodnar

**SHERIDAN,** District Judge

     THIS MATTER comes before the Court on the motion of

defendants, Michelle R. Ricci and R. Bodnar, Correctional

Officer, for summary judgment, pursuant to <u>Fed.R.Civ.P.</u> 56(c).

(Docket entry no. 75).  Plaintiff submitted a letter in

opposition to defendants' motion.  (Docket entry no. 81).

Defendants filed a letter reply on February 27, 2012.  (Docket

entry no. 84).  This matter is being considered on the papers

pursuant to Fed.R.Civ.P. 78.  For the reasons set forth below,
defendants' motion will be granted.

## I.   BACKGROUND

On or about April 25, 2008, plaintiff, Shawn L. Robinson
("Robinson"), filed a civil rights Complaint, pursuant to 42
U.S.C. § 1983, against defendants, Michelle Ricci, former
Administrator of the New Jersey State Prison ("NJSP");  William
Wade, Jr., Unit Staff Officer at NJSP, and Richard Bodnar, a NJSP
Senior Corrections Officer ("SCO").  In his Complaint, Robinson
alleged that, on January 3, 2008, he was scheduled to use the
prison law library, but defendant Wade denied plaintiff access to
the library that day.  Robinson filed an administrative remedy,
but Wade issued a false disciplinary report against plaintiff,
charging plaintiff with having a towel and clear plastic covering
the bars on his cell door.  Robinson spent 16 days in
disciplinary detention without any recreation or running water.
He filed numerous administrative remedies concerning the
conditions in disciplinary detention, which also included
allegations that he was denied clean laundry and access to his
legal documents.  Robinson also states that he appealed the
disciplinary decision.  (Compl., Statement of Claims at ## 1-
7).

The Complaint also alleged that a number of Robinson's
administrative remedies were not filed or answered, including his

initial grievance concerning the denial of access to the law library, thus preventing him from exhausting his administrative remedies.  After Robinson appealed the disciplinary decision, defendant Wade falsified two more disciplinary reports against plaintiff.  Robinson claims that he received severe sanctions for these two minor infractions, even though he had not incurred any disciplinary infractions for a year, and others with more serious infractions received less severe sanctions than plaintiff.[1] (Compl., Statement of Claims at ## 8-9).

On February 14, 2008, defendant Wade went to plaintiff's cell after plaintiff allegedly received permission to make a telephone call to the ombudsman.  Wade purportedly unplugged the phone and told plaintiff: "Since you like to call the ombudsman, I am going to make sure you never use the phone again."  The next day, plaintiff received a disciplinary report for "unauthorized use of mail or telephone."  Robinson alleges that Wade and others retaliated against him for filing grievances by falsifying reports against plaintiff concerning the telephone incident, and refuting plaintiff's claim that he was given permission to use the phone.  (Compl., Statement of Claims at ## 10-15).

---

[1]  The sanctions imposed included: 30 days disciplinary detention; 30 days loss of telephone privilege; 30 days loss of recreation; 120 days loss of good time credit, and 180 days of administrative segregation.

3

On February 15, 2008, unit staff officer Avino also unplugged the telephone plaintiff was using to call the ombudsman.  Robinson immediately requested to see a supervisor. The supervisor, Sgt. C. Goode, went to plaintiff's cell and Avino told the sergeant that he had a problem with plaintiff using the phone during count.  Robinson complains that he was not permitted to call Sgt. Goode at his disciplinary hearing, and there was no physical evidence submitted at the hearing.[2]  Robinson further alleges that, while the disciplinary hearing officer ("DHO") was questioning Avino at the disciplinary hearing, plaintiff overheard staff officer Bodnar tell the court-line that they should "bury" plaintiff.  The DHO allegedly responded, "Don't worry, I am going to hang that nigger."  Robinson appealed the DHO's decision without success.  (Compl., Statement of Claims at ## 16-23).

Robinson repeats allegations that defendants have prevented him from exhausting his administrative remedies by not responding to his grievances or not filing them.  Robinson complains that the grievance system at New Jersey State Prison is ineffective because the inmate does not get a receipt or notification when a

---

[2]  It is not clear from the Complaint whether the disciplinary hearing plaintiff mentions concerns the earlier infraction of January 3, 2008 (involving the towel and plastic allegedly covering plaintiff's cell) or some other alleged infractions.  Robinson states that defendant Wade filed false disciplinary reports against plaintiff, but does not mention whether these institutional charges were referred for a hearing.

grievance is submitted.  There also are no boxes available to submit administrative remedy forms or grievances.  (Compl., Statement of Claims at ¶¶ 24-26).

Robinson further complains that the grievance system is faulty because the lack of confidentiality exposes the complaining inmate to reprisals and harassment by the NJDOC staff.  He claims that his mail has been tampered with on numerous occasions since he entered the state prison, and his incoming legal mail has been opened outside of his presence and held until the court deadlines had passed with respect to his § 2254 habeas petition and another § 1983 complaint filed in Connecticut.  Robinson alleges that his outgoing legal mail also has been delayed or has not been mailed as requested.  (Id. at ¶¶ 27-32).

In addition, Robinson complains that he has been denied adequate access to the law library, legal assistance and legal materials since he was placed at the New Jersey State Prison.  He claims that defendant Ricci has deprived him of his legal materials and personal property while he was in disciplinary detention.  He filed grievances concerning these issues in January and February 2008, but has not received any response.  Plaintiff also states that he wrote grievances concerning threats

of bodily harm made against him by NJDOC staff officer R. Bodnar[3]
while plaintiff was in restraints, but this grievance went
unanswered.  (Id. at ¶¶ 33-39).

Plaintiff further alleges that Bodnar and other staff
subjected him to an unlawful and unsupervised strip search in
order to provoke plaintiff into a verbal and physical
confrontation.  Robinson also complains that he has been
subjected to strip searches inside of his cell on many occasions
without a supervisor present and without any reasonable suspicion
that plaintiff had contraband.  At one instance, Bodnar allegedly
swung his baton at plaintiff's head and threatened to "beat his
brains out."  (Id. at ¶¶ 40-41, 51-53).

Next, Robinson complains that he was given one sheet,
blanket and towel while he was in disciplinary detention, which
had a chemical smell that made plaintiff gravely ill.  He had to
be sent to the infirmary because he was having chest pains,
difficulty breathing, fever and high blood pressure.  Plaintiff
also had coughing and spat up blood.  However, after only one
night in the infirmary, Robinson was sent back to disciplinary
detention.  In contrast, he had been held in the infirmary for

---

[3]  Robinson does not name Correctional Officer Bodnar as a
defendant in his Complaint, but the body of his Complaint,
namely, his lengthy statement of claims repeatedly alleges that
Bodnar violated his constitutional rights.  Therefore, this Court
will presume that plaintiff intended to name Bodnar as a
defendant, and will direct the Clerk of the Court to amend the
docket to reflect Bodnar as a named defendant in the caption.

almost a week when he had hurt his toe.  Bodnar escorted plaintiff back to his cell, verbally harassing plaintiff along the way.  When plaintiff returned to his cell, Bodnar opened the window so that Robinson would be cold.  (Id. at ¶¶ 42-46, 50).

Robinson also complains that defendant Ricci has not answered plaintiff's grievances concerning Bodnar's harassment on February 27, 2008, when Bodnar came to plaintiff's cell and made a gesture of plaintiff being hanged.  Bodnar also made racially derogatory remarks to plaintiff on January 17, 2008, which were never addressed by Ricci.  (Id. at ¶¶ 47-49).

Robinson next complains about the conditions of his confinement during disciplinary detention in January 2008.  He states that he was placed in a cell for 16 days without running water.  In addition, Robinson states that he filed grievances about the ventilation system and lack of fresh air in his housing unit, but nothing has been done to address the problem.  He states that defendant Ricci does not conduct daily or weekly tours of the close custody and special housing units, and many inmates allegedly die or take their life because of the poor living conditions there.  Robinson also alleges that he has been denied clean clothes and laundry services while he was held in disciplinary detention.  He was forced to take cold showers and sleep on the floor of a flooded cell.  When another correctional

officer tried to help plaintiff, Robinson claims that Ricci fired the officer.  (Id. at ¶¶ 55, 66-71).

Robinson further alleges that he has been deprived of outside recreation for a substantial period of time.  In January 2008, plaintiff was denied outside recreation for 19 consecutive days.  After he complained about this lack of yard recreation by filing a grievance, he was sanctioned with 30 days loss of outside recreation.  He was again sanctioned with 30 days loss of yard recreation after he served his 30 days disciplinary detention.  Robinson complains that he has been denied recreational time for very long periods of time, even when he was in general population.  Yard recreation has been denied to those in the administrative segregation unit and disciplinary detention altogether.  (Id. at ¶¶ 57-65).

Moreover, Robinson states that he has been denied adequate health care and medical treatment for his difficulty breathing and his coughing and spitting up blood.  He also alleges that he was assaulted by a DOC staff officer when he was in the mental health unit.  (Id. at ¶¶ 70, 72).

Next, Robinson complains that the correctional staff would throw his clothes on the dirty floor during the strip searches, subjecting plaintiff to skin diseases and staph infections.  His shoes also were confiscated during this time after the strip search.  Specifically, Robinson alleges that the dirty linens and

8

clothes cause damage to his lungs and skin from disease and staph infections.  He claims that his eyes, face, skin, nose, mouth and throat start burning when he sleeps on his sheets.  The medical staff allegedly told plaintiff that the hard soap used in the laundry causes this to happen.  Robinson complains that he has not been given a pass to have mild soap used for his laundry to alleviate this problem.  Robinson finally alleges that he was denied medical treatment after his eyes were accidentally sprayed with a cleaning disinfectant.  He alleges that all of these problems started when defendant Wade started working in the unit where plaintiff is housed.  (Id. at ¶¶ 54, 56, 73-79).

In his Complaint, Robinson seeks immediate medical treatment for his injuries and conditions, and asks that his legal mail and materials be returned to him immediately.  He further seeks injunctive relief, namely, his return to general population in the prison, outside recreation time, and the cessation of all harassment and retaliation.  Finally, Robinson asks for compensatory and punitive damages in an unspecified amount. (Compl., Relief).

In an Opinion and Order entered on December 1, 2008, the Honorable Garrett E. Brown, Jr., U.S.D.J., dismissed without prejudice plaintiff's claims asserting denial of recreation, denial of medical care, denial of access to the prison law library, and the filing of false disciplinary charges, pursuant

to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim at this time.  However, plaintiff's conditions of confinement claim, his unconstitutional strip search claim, his interference with the mail claim, and his claim alleging retaliation by defendants, were allowed to proceed.  (Docket entry nos. 3 and 4).

On February 11, 2010, defendants Ricci and Bodnar filed an answer to the Complaint in this matter.  (Docket entry no. 35). Defendant Wade was never served and never answered the Complaint. (Docket entry nos. 13, 22, 27, 45).

In a letter dated May 4, 2009, and received by the Court on June 1, 2009, Robinson informed the Court that the Connecticut Department of Corrections had transferred plaintiff from NJSP to a state prison facility in Rhode Island.  Robinson also informed the Court at that time that his transfer was effected without any of his legal materials or property.  (Docket entry no. 19).

On or about July 20, 2009, Robinson filed a motion seeking leave to amend his Complaint to address unspecified claims of continuing civil rights violations.  (Docket entry no. 25).  The motion was granted by Order dated September 30, 2009, giving Robinson until October 30, 2009 to file his amended Complaint. (Docket entry no. 26).  Robinson sought an extension of time to file his amended Complaint, which was granted by Order entered on December 3, 2009.  (Docket entry nos. 30 and 34).

After a protracted period of discovery issues, on October 25, 2010, Robinson again sought leave to file an amended or supplemental Complaint to add claims concerning a number of violations by several prison officials and staff before, during and after the time that plaintiff had filed his initial Complaint in April 2008. Robinson alleged that he was unable to amend his Complaint earlier because he had been involuntarily transferred to the Rhode Island Department of Corrections in April 2009. (Docket entry no. 59).

Defendants filed a brief opposing Robinson's request to file an amended or supplemental Complaint. Namely, defendants argued that several of plaintiff's proposed amended claims did not relate back to the original Complaint, and that several other claims should have been included in the original Complaint. Defendants further argued that the remaining claims in the proposed amendment were nothing more than a restatement of the claims that had been dismissed by Judge Brown in the December 1, 2008 Opinion and Order. (Docket entry no. 61).

By Order issued on December 9, 2010, the Honorable Tonianne J. Bongiovanni, U.S.M.J. denied plaintiff's motion for leave to file an amended or supplemental Complaint, finding that Robinson's delay of eleven months in seeking to file his amended Complaint was "undue" in that "it places an unwarranted burden on both the Court and the opposing party due to the fact that

discovery in this case is almost complete and there have already been numerous extensions place on the schedule" of this matter. (Docket entry no. 62).

On April 26, 2011, defendants Ricci and Bodnar filed the instant motion for summary judgment.  (Docket entry no. 75).

On June 24, 2011 this matter was reassigned by then Chief Judge Brown to the undersigned.  (Docket entry no. 77).  Because no response or any other communication had been received from Robinson with respect to the pending summary judgment motion, a Notice of Call for Dismissal pursuant to Rule 41.1 was issued on December 5, 2011.  (Docket entry no. 78).  Robinson responded to the Notice on December 12, 2011, informing the Court that plaintiff was allegedly denied access to the courts by Rhode Island state prison officials, which hindered his prosecution of this matter.  (Docket entry no. 79).  The Call for Dismissal was rendered moot on December 20, 2011.

On February 2, 2012, Robinson filed a motion for an extension of time to respond to defendants' motion for summary judgment.  (Docket entry no. 81).  This Court granted plaintiff's request by Order dated February 8, 2012, giving Robinson until February 17, 2012 to file his opposition papers.  (Docket entry no. 82).

Robinson filed his opposition on or about February 21, 2012. (Docket entry no. 83).  Defendants filed a reply on February 27, 2012.  (Docket entry no. 84).

## II.   DISCUSSION

### A.  Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219, n. 3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63

F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811

F.2d 225, 231 (3d Cir. 1987).

Rule 56(e) of the Federal Rules of Civil Procedure provides,

in relevant part:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon
> the mere allegations or denials of the adverse party's
> pleading, but the adverse party's response, by affidavits or
> as otherwise provided in this rule, must set forth specific
> facts showing that there is a genuine issue for trial. If
> the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).  The rule does not increase or decrease a

party's ultimate burden of proof on a claim.  Rather, "the

determination of whether a given factual dispute requires

submission to a jury must be guided by the substantive

evidentiary standards that apply to the case." Anderson, 477

U.S. at 255.

Under the Rule, a movant must be awarded summary judgment on

all properly supported issues identified in its motion, except

those for which the nonmoving party has provided evidence to show

that a question of material fact remains.  See Celotex, 477 U.S.

at 324.  Put another way, once the moving party has properly

supported its showing of no triable issue of fact and of an

entitlement to judgment as a matter of law, for example, with

affidavits, which may be "supplemented ... by depositions,

answers to interrogatories, or further affidavits," id. at 322 n.

3, "its opponent must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita, 475

U.S. at 586 (citations omitted); see also Anderson, 477 U.S. at 247-48 (stating that "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

What the nonmoving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990)(stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993)(stating that "[t]o raise a genuine issue of material fact, ... the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[ ] the 'mere scintilla' threshold and ... offer[ ] a genuine issue of material fact.").

The Local Civil Rules supplement the Federal Rules of Civil Procedure and provide that "each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." L. Civ. R. 56.1. "Where possible, a

single joint Rule 56.1 statement is favored."  Allyn Z. Lite, New Jersey Federal Practice Rules 192 (2006 ed.) (citations omitted).  "Where a joint statement is not prepared, then, under the rule, 'facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.'"  Id. at 193 (citations omitted).  However, "the parties' statements pursuant to Local Rule 56.1 "cannot bind the Court if other evidence establishes that the stipulated facts are in error."  Id. (citation omitted).

B.  Failure to Exhaust Administrative Remedies

     Defendants first argue that Robinson's claim that he was forced to sleep on the floor of a flooded cell should be dismissed because plaintiff failed to exhaust his administrative remedies with respect to this particular claim.

     Defendants set forth the inmate grievance procedure for inmates at NJSP as follows.  In accordance with N.J.A.C. 10A:8-1.1 to 10A:8-3.6, the NJSP has adopted Inmate Handbooks in 2001 and 2007, that set forth the rights and privileges of its inmates at NJSP.  The Inmate Handbook also sets forth the inmate grievance procedure at NJSP, which includes the procedures for inmates to submit a complaint, problem or suggestion to the attention of the administration at NJSP.  (Defendants' Declaration of Brenda A. Hutton, ¶¶ 2-6 and Exhibits B and C, at Docket entry no. 75-4).

16

In particular, Inmate Remedy System Forms ("IRSF") are made available to NJSP inmates within their housing units, at the prison law library, and from the unit social workers.  (Hutton Decl., ¶ 7 and Exs. B and C).  Once an inmate completes the IRSF and submits it, the IRSF is given to the appropriate staff person for a response within 30 days.  Additional forms addressing the same problem or complaint are not to be submitted before the end of this 30-day response period and will not be processed if received during that time.  (Hutton Decl., ¶ 8, Exs. B and C).

After a staff person has responded to the grievance, the IRSF is then given to the Administrator, Associate Administrator, or Assistant Superintendent, who signs the IRSF indicating that it was completed, that the inmate received a responsive reply, and that it could be returned to the inmate.  However, the signature does not indicate agreement with the substance of the response.  (Hutton Decl., ¶ 9).  When the inmate receives a response to his IRSF, he may then appeal the response.  After an administrative response is provided to the inmate's appeal, the inmate's administrative remedies have been exhausted.  (Hutton Decl., ¶¶ 10-11 and Exs. B and C).

Defendants provided the records concerning the IRSFs or grievances that Robinson filed with respect to most of the claims at issue in this litigation.  These IRSFs submitted by Robinson from January 2007 through April 2009 are attached to the Hutton Declaration as Exhibit D.  A careful review of the many

grievances filed by plaintiff reveals that Robinson never filed an IRSF complaining that he was forced to sleep on the floor of a flooded cell.  (See Defendants' Statement of Material Facts at ¶ 60, Hutton Decl. at Ex. D).  Accordingly, it would appear that Robinson never attempted to exhaust his administrative remedies with regard to this particular grievance.

In his response to defendants' motion for summary judgment (Docket entry no. 83), Robinson does not dispute the existence of the NJSP administrative remedy and appeal process as set forth above.  He also does not dispute that he never filed an IRSF with regard to his claim that he was forced to sleep on the floor of a flooded cell.  In fact, his response is silent with regard to this issue.  (Docket entry no. 83).

The relevant statute, 42 U.S.C. § 1997e(a), provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002) (citation omitted).  See also Daniels v. Rosenberger, 386 Fed. Appx. 27, 29 (3d Cir. 2010)("[u]nder the Prison[ ] Litigation Reform Act, a prisoner must exhaust available administrative remedies before bringing suit concerning prison

conditions")(citing 42 U.S.C. § 1997e(a)).  Exhaustion is
mandatory.  A prisoner must exhaust all available administrative
remedies even where the relief sought, such as monetary damages,
cannot be granted through the administrative process.  Booth v.
Churner, 532 U.S. 731 (2001).

Section 1997e(a) requires "proper exhaustion," as that term
is used in administrative law.  Woodford v. Ngo, 548 U.S. 81,
90-93 (2006).  "Proper exhaustion demands compliance with an
agency's deadlines and other critical procedural rules."  Id. at
90-91.  Compliance with the prison grievance procedures is all
that is required for "proper exhaustion."  "The level of detail
necessary in a grievance to comply with the grievance procedures
will vary from system to system and claim to claim, but it is the
prison's requirements ... that define the boundaries of proper
exhaustion."[4]  Jones v. Bock, 549 U.S. 199, 218 (2007)(holding

---

[4]  In Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002),
the Third Circuit addressed the issue of whether the grievance
procedure in an inmate handbook promulgated by a NJDOC state
prison, but not formally adopted by the State Department of
Corrections, constituted an administrative remedy for purposes of
Section 1997e(a) of the PLRA.  Though the grievance procedure at
issue was deemed a "relatively informal [one] ... established by
the prison administrators of the NJSP and published in the
Department of Corrections Inmate Handbook[,]" the process was
considered an "administrative remedy" within the meaning of the
PLRA for several reasons.  Id. at 1352-54.  First, it gave
inmates the opportunity to inform prison administration about any
complaints.  Second, it provided for written responses to
inmates.  Third, the written responses were subject to review by
supervisors.  Fourth, final resolutions required signatures by
multiple administrative parties.  Id. at 1354.  Important in the
Third Circuit's calculus was the fact that the grievance
procedure at issue furthered an important goal of the PLRA:
providing a forum through which inmates could potentially resolve
their disputes, thereby reducing the quantity of prisoner

exhaustion was not per se inadequate simply because individual later sued was not named in grievance, where prison policy did not require prisoner to identify particular responsible party); see Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004)(prison grievance procedures supply yardstick for determining required steps for exhaustion).

The exhaustion requirement includes a procedural default component. See id. at 230. A court may consider extrinsic materials for determining whether a procedural default should be excused. See Williams v. Beard, 482 F.3d 637 (3d Cir. 2007). Exhaustion is a requirement even where the prisoner seeks a remedy that the administrative grievance process does not or cannot provide, such as monetary damages. Woodford, 548 U.S. at 85. The Third Circuit came to the same conclusion several years earlier when it found that no "futility exception" exists which would excuse a failure to exhaust remedies even when the remedy sought is unavailable. Nyhuis v. Reno, 204 F.3d 65, 71 (3d Cir. 2000).

As recognized by the Supreme Court, the PLRA serves multiple purposes. "Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits[.]"

---

litigation. Id. at 1354-55. Furthermore, "[f]or cases ultimately brought to court, the remedy form submitted by the inmate and the written response provided by the prison administration could facilitate adjudication by clarifying the contours of the controversy." Id. at 1354-55 (citing Porter, 534 U.S. at 525). Whether or not an administrative remedy is formally adopted by a State Department of Corrections is "irrelevant to these rationales for exhaustion." Id. at 1354.

Porter v. Nussle, 534 U.S. at 524.  The PLRA affords corrections officials with "time and [an] opportunity to address complaints internally before allowing the initiation of a federal case." Id. at 525.  By providing this opportunity to administratively remedy an inmate grievance, it may be possible to "obviat[e] the need for litigation."  Id. at 525 (citing Booth v. Churner, 532 U.S. at 737).  In other cases, the administrative review process may serve to "filter out some frivolous claims [.]"  Booth, 532 U.S. at 737.  Importantly, the PLRA applies not only to "prison conditions" as per the plain text of the statute, but also to "occurrences" affecting prisoners and "prison life" in general. Porter, 534 U.S. at 521, 532.

The undisputed facts in this case demonstrate that Robinson failed to exhaust his administrative remedies regarding his alleged claim that he was forced to sleep on the floor of a flooded cell before bringing this claim to federal court.  This absence of exhaustion is critical given the fact that Robinson repeatedly resorted to NJSP's administrative remedy system with respect to his other complaints concerning the conditions of his confinement, as well as other incidents of prison life.  (See Hutton Decl. at Ex. D).  Defendants are thus entitled to summary judgment with regard to this limited claim.

C.  <u>Supervisor Liability As To Defendant Ricci</u>

Next, defendants argue that the Complaint should be dismissed in its entirety as against defendant Ricci because it is based upon an impermissible theory of respondeat superior and Robinson has failed to show that Ricci had any personal involvement in the alleged constitutional violations.  Robinson does not address this argument in his response to defendants' motion for summary judgment.  Thus, it is essentially unopposed.

As a general rule, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of <u>respondeat superior</u>.  <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1948; <u>Monell v. New York City Dept. Of Social Servs.</u>, 436 U.S. 658, 691 (1978)(finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); <u>Robertson v. Sichel</u>, 127 U.S. 507, 515-16 (1888)("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of subagents or servants or other persons properly employed by or under him, in discharge of his official duties").  In <u>Iqbal</u>, the Supreme Court held that "[b]ecause vicarious or supervisor liability is inapplicable to <u>Bivens</u>[5] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  <u>Iqbal</u>, 129 S.Ct. at 1948.  Thus, each government official is liable only for

---

[5]  <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971)

his or her own conduct.  The Court rejected the contention that supervisor liability can be imposed where the official had only "knowledge" or "acquiesced" in their subordinates conduct.  <u>Id.</u>, 129 S.Ct. at 1949.

Under pre- <u>Iqbal</u> Third Circuit precedent, "[t]here are two theories of supervisory liability," one under which supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and another under which they can be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 127 n. 5 (3d Cir. 2010)(internal quotation marks omitted).  "Particularly after <u>Iqbal</u>, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue." <u>Id</u>. at 130.

The Third Circuit has recognized the potential effect that <u>Iqbal</u> might have in altering the standard for supervisory liability in a § 1983 suit but, to date, has declined to decide whether <u>Iqbal</u> requires narrowing of the scope of the test.  <u>See</u> <u>Santiago</u>, 629 F.3d 130 n. 8; <u>Bayer v. Monroe County Children and Youth Servs.</u>, 577 F.3d 186, 190 n. 5 (3d Cir. 2009)(stating in

light of Iqbal, it is uncertain whether proof of personal
knowledge, with nothing more, provides sufficient basis to impose
liability upon supervisory official).  Hence, it appears that,
under a supervisory theory of liability, and even in light of
Iqbal, personal involvement by a defendant remains the touchstone
for establishing liability for the violation of a plaintiff's
constitutional right.  Williams v. Lackawanna County Prison, 2010
WL 1491132, at *5 (M.D.Pa. Apr. 13, 2010).

     Facts showing personal involvement of the defendant must be
asserted; such assertions may be made through allegations of
specific facts showing that a defendant expressly directed the
deprivation of a plaintiff's constitutional rights or created
such policies where the subordinates had no discretion in
applying the policies in a fashion other than the one which
actually produced the alleged deprivation; e.g., supervisory
liability may attach if the plaintiff asserts facts showing that
the supervisor's actions were "the moving force" behind the harm
suffered by the plaintiff.  See Sample v. Diecks, 885 F.2d 1099,
1117-18 (3d Cir. 1989); see also Iqbal, 129 S.Ct. at 1949-54.

     Here, Robinson provides no facts describing how defendant
Ricci, the former Administrator at NJSP when plaintiff was
confined there, allegedly violated his constitutional rights.  He
fails to allege facts to show that Ricci expressly directed the
deprivation of his constitutional rights, or that Ricci created
policies which left subordinates with no discretion other than to

apply them in a fashion which actually produced the alleged
deprivation.   Rather, the Complaint simply relies on recitations
of legal conclusions and provides no articulate facts to support
any personal involvement by defendant Ricci.   Robinson's bare
allegations, "because they are no more than conclusions, are not
entitled to the assumption of truth."   Iqbal, 129 S.Ct. at 1950.

     At best, Robinson seems to contend that, by virtue of her
position as Administrator of NJSP, Ricci directed the conduct of
her subordinates, or acquiesced in policies concerning the
conditions of Robinson's confinement, the strip searches and
alleged interference with his legal mail.   There is no factual
allegation other than this bare legal conclusion, and no evidence
to show any personal involvement or participation by defendant
Ricci.   Further, it would appear that plaintiff's IRSFs were
reviewed and signed by Administrator Ricci's designee instead of
Ricci herself, so that even in this regard, she was not
personally aware of plaintiff's complaints.   Moreover, Ricci
cannot be imputed with personal knowledge and acquiescence in the
prior alleged conduct solely by virtue of receiving or reviewing
plaintiff's IRSFs or grievances.   See Brooks v. Beard, 167 Fed.
Appx. 923, 925 (3d Cir. 2006)(not published)(allegations that
prison officials and administrators responded inappropriately to
inmate's later-filed grievances do not establish the involvement
of those officials and administrators in the underlying
deprivation); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)

(granting summary judgment to nonmedical prison officials whose involvement with prisoner's healthcare was limited to failing to respond to prisoner's letters explaining his predicament); Davila-Bajana v. Sherman, 278 Fed. Appx. 91, 93-94 (3d Cir. 2008) (not published); see also Monroe v. Phelps, 2010 WL 1752253 *3 (D.Del. April 29, 2010); Cole v. Sobina, Civ. No. 04-99J, 2007 WL 4460617 (W.D.Pa. Dec.19, 2007); Ramos v. Pennsylvania Dep't of Corr., Civ. No. 06-1444, 2006 WL 2129148 (M.D.Pa. July, 27, 2006). Accordingly, this Court will grant summary judgment in favor of defendant Ricci.

D.  Official Capacity Claim

Next, defendants argue that plaintiff's claims against them in their official capacities must be dismissed because such claims are barred by the Eleventh Amendment and because the defendants, Ricci and Bodnar, in their official capacities are not "persons" subject to suit under 42 U.S.C. § 1983.

The Eleventh Amendment to the United States Constitution provides that, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." As a general proposition, a suit by private parties seeking to impose a liability which must be paid from public funds in a state treasury is barred from federal court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the

state itself or by federal statute.  See, e.g., Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984). Thus, based on the doctrine of sovereign immunity, states cannot be sued in federal court, unless Congress has abrogated that immunity or the State has waived it.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).

Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985).  This immunity extends to state agents or officials when the "action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to sovereign immunity from suit even though individual officials are nominal defendants."  Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 431 (1997).  Section 1983 does not override a state's Eleventh Amendment immunity.  Quern v. Jordan, 440 U.S. 332 (1979).  Therefore, "[a]s a matter of law, suits against individuals acting in their official capacities are barred by the Eleventh Amendment."  Holland v. Taylor, 604 F. Supp.2d 692, 699 (D. Del.  2009).  See also Davis v. New York, 316 F.3d 93, 101 (2d Cir. 2002).

Here, to the extent that Robinson may allege that defendants Ricci and Bodnar were acting in their official capacities, his

claims against these defendants would essentially be against the state.  Further, there is no indication here that either abrogation or waiver is applicable to Robinson's claims.  Therefore, sovereign immunity works to bar the federal claims in this suit against defendants, Ricci and Bodnar, in their official capacities.  Title 28 U.S.C. § 1915(e)(2)(B)(iii) requires this Court to dismiss the claims if they "seek[ ] monetary relief from a defendant who is immune from such relief."

Beyond sovereign immunity, the § 1983 Complaint is invalid against Ricci and Bodnar because these defendants, in their official capacities, are not "persons" under § 1983.  See Quern v. Jordan, 440 U.S. 332, 345 (1979)("[A] state is not a 'person' for purposes of 42 U.S.C. § 1983."); Hafer v. Melo, 502 U.S. 21, 25 (1991)("Suits against state officials in their official capacity ... should be treated as suits against the state."). See Hussein v. New Jersey, Civil No. 09-1291 (JBS), 2010 WL 376609, at *4 (Jan. 26, 2010) (dismissing a Section 1983 claim against the State of New Jersey and Corzine as the state and state officials in their official capacities are not persons for Section 1983 purposes).

Finally, a Complaint may proceed against defendants in their official capacities if plaintiff is suing "a state official in his official capacity for injunctive relief to force the State or state agency for whom the official works to obey the Constitution," citing Pennhurst, 465 U.S. at 102-05 and Ex parte Young, 209 U.S. 123, 160 (1908).  However, because Robinson is no

longer confined at New Jersey State Prison, where the alleged
constitutional violations occurred, and was transferred from that
facility to Connecticut on or before May 2009, any claim for
injunctive relief has been rendered moot.  A prisoner lacks
standing to seek injunctive and declaratory relief if he is no
longer subject to the alleged conditions.  See Abdul-Akbar v.
Watson, 4 F.3d 195, 197 (3d Cir. 1993); Weaver v. Wilcox, 650
F.2d 22, 27 (3d Cir. 1981).

Therefore, the Court will grant defendants' motion for
summary judgment and accordingly dismiss the Complaint against
defendants, Ricci and Bodnar, in their official capacities.

E.   Conditions of Confinement Claim

Next, defendants contend that Robinson's Eighth Amendment
conditions of confinement claim fails to rise to the level of a
constitutional violation, and therefore, they are entitled to
summary judgment in their favor on this claim.

Robinson's claim concerning the conditions of his
confinement at NJSP alleges as follows: (1) that in January 2008,
he spent 16 days in disciplinary detention without running water;
(2) that, also in January 2008 and again in March 2008, defendant
Bodnar and others deliberately opened the back windows in the
housing unit so that Robinson would be cold; (3) that, in January
2008, he was forced to take cold showers while confined in
disciplinary detention, and again in March 2008, he had to take
cold showers for two weeks while in the detention unit; (4) that,
in March 2008, there was poor ventilation and lack of fresh air

29

in NJSP; and (5) that, in January 2008, while in disciplinary detention, he was denied clean clothes and laundry services for sixteen days, and that in February and March 2008, he was denied weekly laundry services and an adequate amount of clean clothes, which allegedly was both inhumane and unsanitary.

Robinson filed grievances concerning all of these alleged conditions.  Defendants provided responses to Robinson's complaints.  Namely, the complaint about the lack of running water was addressed by allowing plaintiff to put water in a cup for drinking and for hygiene purposes.  Defendants also responded that the water pressure was low in plaintiff's cell and notified maintenance for repair.  (Hutton Decl., Ex. D).  Robinson's complaints about the opening of windows in his housing unit was investigated and were not substantiated.  In one instance, defendant Bodnar was not on the housing unit the date plaintiff had accused him of opening the windows.  (Id.).

As to the cold showers while in disciplinary detention, Robinson's complaints were forwarded to maintenance.  It also was noted that plaintiff was released from disciplinary detention on March 21, 2008, which rendered his complaints moot.  (Id.).  Responses to Robinson's complaints about laundry services indicate that plaintiff was allowed to avail himself of laundry services on January 30, 2008.  (Id., see also Defendants' Statement of Material Facts at ¶ 47).

"The Eighth Amendment's prohibition on 'cruel and unusual punishment' ... imposes on [prison officials] a duty to provide

30

'humane conditions of confinement.'" Betts v. New Castle Youth Development, 621 F.3d 249, 256 (3d Cir. 2010)(quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994), cert. denied, 2011 WL 196324 (2011)). That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must "result in the denial of 'the minimal civilized measure of life's necessities.'" Id. at 835 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1982)).

To state a claim under the Eighth Amendment, an inmate must allege both an objective and a subjective component. Wilson v. Seiter, 501 U.S. 294, 298 (1991); Counterman v. Warren County Corr. Fac., 176 Fed. Appx. 234, 238 (3d Cir. 2006). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' ... are sufficiently grave to form the basis of an Eighth Amendment violation." Helling v. McKinney, 509 U.S. at 32 (quoting Rhodes, 452 U.S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. Hudson v. McMillian, 503 U.S. 1, 9 (1992).

The subjective component requires that the state actor have acted with "deliberate indifference," a state of mind equivalent

to a reckless disregard of a known risk of harm.  See Farmer v.
Brennan, 511 U.S. 825, 835 (1994); Wilson, 501 U.S. at 303.
A plaintiff may satisfy the objective component of a conditions-
of-confinement claim if he can show that the conditions alleged,
either alone or in combination, deprive him of "the minimal
civilized measure of life's necessities," such as adequate food,
clothing, shelter, sanitation, medical care, and personal safety.
Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F .2d 351, 364
(3d Cir.1992).  However, while the Eighth Amendment directs that
convicted prisoners not be subjected to cruel and unusual
punishment, "the Constitution does not mandate comfortable
prisons."  Rhodes, 452 U.S. at 349.  To the extent that certain
conditions are only "restrictive" or "harsh," they are merely
part of the penalty that criminal offenders pay for their
offenses against society.  Id. at 347.  An inmate may fulfill the
subjective element of such a claim by demonstrating that prison
officials knew of such substandard conditions and "acted or
failed to act with deliberate indifference to a substantial risk
of harm to inmate health or safety."  Ingalls v. Florio, 968 F.
Supp. 193, 198 (D.N.J. 1997).

This Court finds that the conditions alleged by Robinson in
this case do not rise to the level of a serious constitutional
deprivation.  His complaints about lack of running water, low
water pressure and cold showers were addressed by prison
officials and referred to maintenance.  Thus, plaintiff has not
demonstrated deliberate indifference on the part of defendants.

Also, significantly, Robinson did not endure these alleged conditions for an extended period of time, and in fact, the conditions lasted two weeks to 16 days while he was confined in the disciplinary unit.  As to the cold showers, showers are basic human needs only inasmuch as they are important for maintaining personal hygiene.  See Toussaint v. McCarthy, 597 F. Supp. 1388, 1411 (9th Cir. 1984)(the Eighth Amendment guarantees hygiene). The temperature of the showers, despite being uncomfortable, did not preclude Robinson from attending to his hygiene and bathing needs.  As such, this allegation fails to state a cognizable Eighth Amendment claim.  See Newman v. Brandon, 2011 WL 533580, *5 (E.D. Cal. Feb. 12, 2011).

Moreover, Robinson offers no evidence to establish that these allege conditions "pos[ed] a substantial risk of serious harm." Farmer, 511 U.S. at 834; see also Banks v. Mozingo, 423 Fed. Appx. 123, 127-28 (3d Cir. Apr. 18, 2011); Williams v. Delo, 49 F.3d 442, 444-47 (8th Cir. 1995)(finding no Eighth Amendment violation where inmate was placed in a strip cell without clothes, the water in the cell was turned off and the mattress removed, and inmate's bedding, clothes, legal mail and hygiene supplies were withheld).

Therefore, even taking the alleged conditions altogether, this Court finds that summary judgment in favor of defendants should be granted because Robinson has failed to show any substantial risk of serious harm, deliberate indifference on the part of defendants, or that the conditions, even when taken as a

whole, did not last for an extended period of time so as to cause
harm.  See, for example, Woodley v. FCC Penitentiary, 2011 WL
5175185, *5 (C.D. Cal. Nov. 1, 2011)(defendant's refusal to give
plaintiff clean clothes and took bedding and clothes from
plaintiff on a daily basis was insufficient to establish the
"circumstances, nature and duration" of the alleged deprivation
of adequate clothing and bedding, quoting Johnson . Lewis, 217
F.3d 726, 731 (9th Cir. 2000)).

F.  Legal Mail Claim

     Defendants also contend that they are entitled to summary
judgment on Robinson's claim of interference with his legal mail.
Inmates have a limited liberty interest in their mail under the
First and Fourteenth Amendments; thus, an inmate's constitutional
right to send and receive mail may be restricted only for
legitimate penological interests.  See Thornburgh v. Abbott, 490
U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).
A single interference with the delivery of an inmate's personal
mail, without more, does not rise to the level of a
constitutional deprivation.  Morgan v. Montayne, 516 F.2d 1367
(2d Cir. 1975), cert. denied, 424 U.S. 973 (1976).

     The assertion that legal mail is intentionally opened and
read, delayed for an inordinate period of time, or stolen states
a First Amendment claim.  See Jones v. Brown, 461 F.3d 353 (3d
Cir. 2006), cert. denied, 127 S. Ct. 1822 (2007)(holding that the
legal mail policy of state prisons in opening legal mail outside
the presence of the inmate violated the inmate's First Amendment

right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff); Biereg̲u̲ v. Reno, 59 F.3d 1445, 1452 (3d Cir. 1995)("[A] pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech. Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court."), implied overruling on other grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). See, also, Antonelli v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v. Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

Allegations of inspection or interference with an inmate's legal mail also may implicate the inmate's Sixth Amendment right to communicate freely with his attorney in a criminal case. See Wolff v. McDonnell, 418 U.S. 539, 575 (1974) (upholding regulation permitting legal mail to be opened and inspected for contraband, but not read, in the presence of the inmate).

In this case, defendants argue that the evidence overwhelmingly shows that there was no pattern or practice of opening the properly marked legal mail of Robinson outside of his presence at NJSP. Defendants point to the one instance that Robinson complained about, which actually turned out not to be legal mail, but instead correspondence from another correctional facility, which is not legal mail unless identified as such.

(Hutton Decl., Ex. D, DOC-Robinson 198).  Further, Robinson's complaints concerning alleged delays in his outgoing and incoming legal mail were mostly sporadic and did not evince a pattern or practice by defendants to deliberately interfere with plaintiff's legal mail.

Therefore, this Court will grant defendants' motion for summary judgment in their favor on this claim.

G.   Strip Search Claim

Defendants also argue that they are entitled to summary judgment with respect to Robinson's claim that he was persistently subjected to unlawful strip searches in violation of his constitutional rights.  Defendants provided copies of the many grievances filed by Robinson.  (Hutton Decl., Ex. D).  Of the numerous grievances, Robinson made the following complaints about strip searches: (1) on February 22, 2008, a general complaint that he was being subjected to strip searches without a supervisor present (Id., DOC-Robinson 132-133); (2) on February 27, 2008, Robinson complained of a strip search without a supervisor present (Id., DOC-Robinson 143-144); (3) on February 28, 2008, a strip search was conducted before his escort to sick call (Id., DOC-Robinson 146-147); (4) on March 6, 2008, a strip search was conducted before his shower escort (Id., DOC-Robinson 176-177); (5) on March 8, 2008, a strip search was conducted before his shower escort (Id., DOC-Robinson 181-182); (6) on March 11, 2008, he was strip searched in his cell when officer asked if Robinson wanted a shower (Id., DOC-Robinson 203-204);

(7) on March 14, 2008, Robinson made a general complaint about strip searches referring to his prior complaints as not being addressed (<u>Id</u>., DOC-Robinson 215); (8) on March 17, 2008, complaint about a visual cavity search before his shower (<u>Id</u>., DOC-Robinson 223); and (9) on April 10, 2008, complaint about a visual cavity strip search conducted out on the tier in front of other inmates (<u>Id</u>., DOC-Robinson 239-240).  In all of these complaints, Robinson objected to the fact that the strip searches were conducted without a supervisor present, he was not being transported outside of the facility and there was no accusation of his concealing weapons or contraband.  None of the grievances accuse defendant Bodnar of conducting the strip searches or that he or defendant Ricci directed that the strip searches be conducted.

Defendants state that strip searches are conducted pursuant to the New Jersey Administrative Code ("NJAC") and NJSP Standing Operating Procedures ("SOP") every time an inmate on close custody status (such as disciplinary detention, administrative segregation, or protective custody) is escorted.  However, defendants fail to provide reference to the pertinent NJSP SOP or the NJAC upon which they rely.  Defendants further contend that because Robinson was on close custody status and was deemed a high risk inmate with a "very aggressive/assaultive history due to his slashing the throat of a corrections officer," Robinson was subjected to a strip search each time he was escorted in the prison.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose.  Id. at 529.  The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted).  The same conclusion was reached with respect to

pretrial detainees other than convicted prisoners.  See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).

Inmates also do not have a Fourth Amendment right to be free of strip searches, which may be conducted by prison officials without probable cause provided that the search is conducted in a reasonable manner.  Bell v. Wolfish, 441 U.S. 520 (1979); Ostrander v. Horn, 145 F. Supp.2d 614, 620 (M.D. Pa. 201).  In Bell, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  Bell, 441 U.S. at 559; see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

Consequently, even if strip searches were conducted repeatedly or unnecessarily, as alleged by Robinson here, there is no Fourth Amendment violation if plaintiff can not show that

the strip searches were conducted in an unreasonable manner.  See Wilson v. Shannon, 982 F. Supp. 337, 339 (E.D. Pa. 1997); Collins v. Derose, 2009 WL 812008, at *5 (M.D. Pa. March 26, 2009). Thus, while strip searches may constitute a "significant intrusion on an individual's privacy," see United States v. Whitted, 541 F.3d 480, 486 (3d Cir. 2008), in the prison or detention facility setting, where officials conduct such searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility, strip searches do not violate the Fourth Amendment.  See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 621 F.3d 296, 309-311 (3d Cir. 2010).

In this case, the evidence shows that the alleged strip searches were conducted pursuant to prison policy and state correctional regulations.  See N.J.A.C. 10A:3-5.7 and 5.8. Robinson was strip searched upon his escort to the showers, medical sick call, and each time he was to be escorted outside of his cell in close custody.  This was mandated by virtue of his close custody status and because he is categorized as a "high risk" inmate with a "very aggressive/assaultive history due to his slashing the throat of a corrections officer" in the past. Consequently, this Court finds that, based on the evidence, the strip searches at issue do not rise to the level of a

constitutional violation under either the Fourth or Eighth

Amendment.[6]

Robinson alleges only one incident where the manner of the

intrusion might be deemed unreasonable because the strip search

was conducted on the tier purportedly in front of other inmates.

Generally, strip searches are to be performed in private.

Nevertheless, the incident was investigated by NJSP officials and

found to be consistent with prison policy.  While the allegations

may give the Court initial pause, overall the evidence shows that

the strip searches were conducted in a reasonable manner.  More

significantly, this particular search and indeed, all of the

alleged strip searches, were not performed by defendant Bodnar.

Accordingly, defendants are entitled to summary judgment on this

claim.

## H.  Retaliation Claim

Defendants argue that plaintiff has failed to make the

requisite showing to support a claim of unconstitutional

retaliation.  "Retaliation for the exercise of constitutionally

protected rights is itself a violation of rights secured by the

Constitution ... ."  White v. Napoleon, 897 F.2d 103, 111-12 (3d

Cir. 1990).  To prevail on a retaliation claim, plaintiff must

demonstrate that (1) he engaged in constitutionally-protected

---

[6]  The Eighth Amendment may be implicated where the strip
search or visual body cavity search was conducted in a brutish
and unreasonable manner.  See for example Jordan v. Cicchi, 428
Fed. Appx. 195 (3d Cir. May 20, 2011)(involving allegations of
excessive force employed during a visual body cavity search).  w

activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)). See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

    As to the first factor, there is no dispute that the filing of grievances is a constitutionally protected activity. See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d cir. 1981). As to the second factor, "a prisoner-plaintiff satisfies [the "adverse action"] requirement by demonstrating that the action 'was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'" Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)(quoting Allah v. Seiverling, 229 F.3d at 225). Determination of this second factor is a fact-sensitive analysis. Allah, supra.

    Finally, as to the third factor, plaintiff has the initial burden of showing that his conduct "was 'a substantial or motivating factor'" in the adverse action. Rauser, 241 F.3d at 333 (importing a burden-shifting framework into the prisoner-retaliation context for proof of a "causal link between exercise

of [an inmate's] constitutional rights and the adverse action taken against him"). To establish this requisite causal connection for a First Amendment retaliation claim, the plaintiff must prove one of two things: "(1) an unusually suggestive proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link." DeFranco v. Wolfe, 387 Fed. Appx. 147, 154 (3d cir., July 14, 2010)(citing Lauren W. Ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)). If neither of these showings is made, then plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation. Id.

The burden then shifts to the defendant, who must "prove by a preponderance of the evidence that it would have taken the same ... action even in the absence of the protected activity." Rauser, 241 F.3d at 334. This is a "deferential standard" meant to take into account "that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials ... who possess the necessary expertise." Id. "[R]easons reasonably related to a legitimate penological interest" are a sufficient basis for defendants to have taken the action against the inmate. Id., 241 F.3d at 334 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). Maintaining prison safety and security is a fundamental, legitimate penological interest. See, e.g., Jones v. Brown, 461 F.3d 353, 361-62 (3d Cir. 2006).

In this case, defendants argue that Robinson has not shown the third factor, namely, that his filing of grievances and complaints was the substantial or motivating factor that caused defendants to take any alleged adverse action against plaintiff. Indeed, the strip searches were conducted pursuant to and consistent with NJSP policy and regulations.  There is no suggestion that the search and the manner of the search was performed in response to Robinson's filing of grievances.

Likewise, Robinson's claims of interference with his legal mail was not substantiated and shown to be inaccurate. Consequently, these alleged actions by defendants do not support a retaliation claim against the defendants.

Further, in support of his retaliation claim, Robinson alleges that Ricci and her staff failed to respond to plaintiff's many remedy forms.  However, as the evidence in this case shows, that allegation is belied by the responses filed to each of Robinson's IRSFs.  Robinson filed numerous grievances, and appealed most of the responses to his grievances by NJSP staff officials and administration.  (See Hutton Decl., Ex. D).

Also, in support of his retaliation claim, Robinson complained that he heard Bodnar tell the court line officer at his disciplinary hearing to "bury Plaintiff because Plaintiff was charged for cutting some [correction officer's] throat."  He further complained that Bodnar threatened him with bodily harm and called him racially derogatory names.  These grievances were investigated and Robinson's complaints were not substantiated.

Indeed, by all accounts, Robinson's complaints were found to be "meritless, manipulative fabrications." (Hutton Decl., Ex. D at DOC-Robinson 129, 130, 131, 215). Accordingly, the Court finds that the record contains no evidence, other than Robinson's self-serving statements, that Bodnar acted in an unconstitutionally retaliatory manner.

Moreover, Robinson cannot show satisfaction of the second factor, that he was deterred in any way from filing grievances or pursuing this protected constitutional activity. In fact, as the record shows, Robinson filed numerous grievances and complaints on almost a daily basis during the time he was confined at NJSP. (Hutton Decl., Ex. D). Thus, none of the purported actions by the defendants, strip searches, interference with legal mail, etc., demonstrate sufficiently adverse action against plaintiff in violation of his constitutional rights. See Burgos v. Canino, 358 Fed. Appx. 302, 307 (3d Cir. 2009)(urinalysis, harassment, threats, temporary inconveniences, and denial of recreation did not rise to level of adverse action against prisoner); Walker v. Bowersox, 526 F.3d 1186, 1190 (8th Cir. 2008)("the two incidents when Knarr directed others to give Walker an alternative meal, although purportedly retaliatory, were not sufficiently severe to amount to a constitutional violation"); Gill v. Tuttle, 93 Fed. Appx. 301, 303-04 (2d Cir. 2004)(to establish retaliation claim, inmate must allege adverse action that imposes a substantial impact on inmate); Jones v. Greninger, 188 F.3d 322, 325-26 (5th Cir. 1999)(although

retaliatory intent was properly alleged, claim that inmate was restricted to five hours per week in law library in retaliation for filing grievances failed because the alleged adverse acts did not rise to level of constitutional claim); Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999)("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse"). See also Potter v. Fraser, 2011 WL 2446642, *8 (D.N.J.  June 13, 2011)(finding that plaintiff's allegations that certain defendants searched his cell on two occasions, threw his t-shirt in the garbage, and confiscated his commissary purchases, in retaliation for filing grievances, were not sufficiently adverse actions).

Accordingly, summary judgment will be granted in favor of defendants with respect to the retaliation claim.

I.  Remaining Arguments

Because this Court has determined that defendants are entitled to summary judgment with respect to plaintiff's remaining claims in his Complaint, there is no need to address defendants' arguments concerning qualified immunity or punitive damages.  As noted above, because Robinson is no longer confined at New Jersey State Prison, where the alleged constitutional violations occurred, and was transferred from that facility to Connecticut on or before May 2009, any claim for injunctive relief has been rendered moot.  A prisoner lacks standing to seek injunctive and declaratory relief if he is no longer subject to

46

the alleged conditions.  See Abdul-Akbar v. Watson, 4 F.3d 195, 197 (3d Cir. 1993); Weaver v. Wilcox, 650 F.2d 22, 27 (3d Cir. 1981).

Finally, plaintiff's claims against defendant Wade must also be dismissed.  Pursuant to Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). The Court notes that previous attempts to serve defendant Wade were unsuccessful. (See docket entry nos. 13, 22, 45) By order dated September 30, 2009, the Court extended the time within which to effect service on this Defendant. (Docket entry no. 27).  At this time, it appears that Defendant Wade has not been served.  As such, the action against this Defendant is subject to dismissal without prejudice after notice to Plaintiff. Fed. R. Civ. P. 4(m). However, based on the Court's finding, supra, that Plaintiff's claims under Section 1983 must be dismissed, the Court finds that providing notice to Plaintiff of the potential Rule 4(m) dismissal would be futile.  Accordingly, Plaintiff's claims against Defendant Wade are dismissed.

III.  <u>CONCLUSION</u>

Therefore, for the reasons set forth above, the motion by defendants Ricci and Bodnar for summary judgment will be granted. Additionally, for the reasons set forth above, this complaint is also dismissed as to defendant Wade and this action will be dismissed in its entirety.  An appropriate order follows.


_s/Peter G. Sheridan_____
PETER G. SHERIDAN, U.S.D.J.

March 29, 2012